IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CRIMINAL NO. 3:06CR415

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| VS. ) | **MEMORANDUM AND** |
| ) | **O R D E R** |
| ) | |
| TAMARA VARNADO ) | |
| ) | |

**THIS MATTER** is before the Court on Defendant's motions for a new trial and for judgment of acquittal filed January 25, 2008. The Government responded in opposition to Defendant's motions on August 7, 2008.[1]

**Opposition to Defendant's Motion for New Trial, filed August 7, 2008;**

---

[1] The Defendant Varnado was granted several extensions of time to file briefs in support of her motions for acquittal and new trial in order to receive the trial transcripts. These extensions of time were unopposed by the Government. Defendant filed the supporting briefs on July 9, 2008. *See* **Brief in Support of Motion for New Trial and Brief in Support of Motion for Judgment of Acquittal, filed July 9, 2008.**
  Defendant Osuji filed a *pro se* motion for a new trial on the basis of ineffective assistance of counsel and prosecutorial misconduct on May 19, 2008. This motion was summarily denied because Defendant was represented by counsel. *See* **Order, filed May 20, 2008.** Defendant Osuji has not filed a post-trial motion for judgment of acquittal or any further motion for a new trial.

**Opposition to Defendant's Motion for Judgment of Acquittal, filed August 7, 2008.** For the reasons set out herein, Defendant's motions for a new trial and judgment of acquittal are denied.

## I. BACKGROUND

Defendant Varnado was originally charged along with co-conspirator Paul Osuji in an eight-count indictment. **Indictment, filed October 25, 2006.** The Grand Jury later returned a superseding indictment containing 18 counts relating to a scheme to defraud the Government's Medicare program and other private health care agencies. ***See*** **Superseding Indictment, filed May 3, 2007.** Count One charged Defendants Varnado and Osuji with conspiracy to defraud the Government in connection with the delivery and payment of health care benefits or services, in violation of 18 U.S.C. §§ 1347 and 1349, committed "within Mecklenburg County, in the Western District of North Carolina, and elsewhere." *Id*. **at 9.** Counts Two through Ten charged Defendants with defrauding health care programs in violation of 18 U.S.C. § 1347, "in Mecklenburg County, within the Western District of North Carolina, and elsewhere." *Id*. **at 10-11.** Count Eleven charged Defendants with a money laundering conspiracy in

violation of 18 U.S.C. § 1956(h), committed "in Mecklenburg County, within the Western District of North Carolina and elsewhere." *Id*. at 12. Counts Twelve through Eighteen charged promotion of money laundering in violation of 18 U.S.C. § 1956, committed "in Mecklenburg County, within the Western District of North Carolina, and elsewhere." *Id*. at 13-14.

Defendants were brought to trial on the superseding indictment January 7-11, 2008, and January 14-15, 2008. **See Transcript ("Tr.") Volumes I-VII, filed June 3, 2008.** The jury returned a verdict finding Defendants guilty on all eighteen counts alleged in the superseding indictment. **See Jury Verdict as to Paul Osuji, filed January 15, 2008; Jury Verdict as to Tamara Varnado, filed January 15, 2008.**

The evidence at trial showed that Osuji was the registered owner of Chimatex, Inc., a company supplying medical equipment based in Charlotte, North Carolina. **Tr. Vol. III,** *supra*, **at 543.** Varnado was the director and registered owner of Medisource 2000 ("Medisource"), a company that delivered medical equipment to Medicare patients, who are also known as beneficiaries. **Tr. Vol. II, at 482.**[2] Prince Yellowe[3] was an

---

[2] Medicare is a federal program that, among other things, provides payment for claims related to medical services and supplies provided to senior citizens and the disabled. **Tr. Vol. I, at 41.** Medicare claim

unindicted co-conspirator who testified during this trial and had previously pled guilty to conspiracy, health care fraud, and money laundering. Yellowe is currently serving a 51-month term of imprisonment. **Tr. Vol. III, at 581-82.**

The superseding indictment charged and the evidence showed that Defendants Varnado, Osuji, and unindicted co-conspirators, Dr. Linda Morgan[4] and Prince Yellowe, conspired to defraud Medicare and certain private pay insurers, such as Cigna, through the following schemes:

1. Submitted false prescriptions and Certificates of Medical Necessity ("CMN") for motorized wheelchairs known as the K-11;

2. Sought reimbursement for the more expensive K-11 and provided beneficiaries with a less expensive scooter;

---

processing is carried out through contract companies such as Cigna Government Services, who take on the responsibility of receiving, processing, and adjudicating claims. *Id.* At issue in the present case are claims submitted for durable medical equipment ("DME"), which includes medical equipment that is reusable, such as a motorized wheelchair or scooter. *Id.* **at 42.**

[3]Prince Owunari Yellowe was previously known by the name "Harold Horatio Iyalla." **Tr. Vol. III, at 578.**

[4]Dr. Linda Morgan agreed with Yellowe and Varnado to provide prescriptions for motorized wheelchairs to beneficiaries without ever examining the beneficiaries as required by Medicare policy. Dr. Morgan was paid $250 for each prescription. **Tr. Vol. III, at 617-619.**

    3.    Sought reimbursement for motorized wheelchairs, but did not provide that equipment to beneficiaries; and

    4.    Sought reimbursement for motorized wheelchairs based on fictitious and backdated claims.

**Superseding Indictment,** *supra,* **at 1; Tr. Vol. I,** *supra,* **at 44-47.**

Yellowe owned First Choice Medical, a company located in Houston, Texas, that provided certain products including motorized wheelchairs ("DME's") to Medicare patients. **Tr. Vol. III, at 588.** First Choice Medical employed individuals known as marketers to recruit Medicare beneficiaries to request DME's. If a beneficiary was interested, the marketer would gather the necessary billing information by making a copy of the Medicare card containing the beneficiary's number. *Id*. **at 597.** Medicare required the beneficiary to obtain a prescription for the DME and a CMN written by an examining physician; the marketer assisted the beneficiary in obtaining these documents. **Tr. Vol. I, at 52.** After a supplier received the signed prescription and CMN, it provided the beneficiary with the medical equipment, a DME in this instance; then the supplier, or other billing agent, billed Medicare for reimbursement. *Id.*

Yellowe also owned First Choice Billing, a company that billed Medicare for the products that were supplied by companies such as First

Choice Medical. *Id*. **at 589.** Following a raid by federal authorities, First Choice Medical was shut down and its supplier number was cancelled. In response, Yellowe and Varnado established Medisource 2000, a new supply company similar to First Choice, but registered it under Varnado's name only in order to obtain a new supplier number. *Id*. **at 593-94.** However, Medisource was unable to obtain a supplier number due to the fact that Medicare placed a moratorium on the issuance of new DME supplier numbers in the Houston area because of concerns of rampant fraud in the Medicare billing and supply business. *Id*. **at 595.**

Through a business contact, Yellowe was introduced to Osuji at the Medisource office in Houston. *Id*. **at 603, 606.** After some discussion, Osuji agreed to allow Yellowe's company, First Choice Billing, to utilize Chimatex's Medicare supplier number. *Id*. **at 609**. Osuji and Yellowe agreed First Choice would obtain DME's using Chimatex's supplier number; Chimatex would then receive reimbursement from Medicare; and after the equipment costs, investment fees, delivery costs, billing fees and other expenses were paid, Medisource and Chimatex would receive an equal share of the profits. *Id*. **at 612-13.** As the scheme progressed,

Varnado employed her own marketers and agreed with Yellowe to split profits according to the above agreement. *Id*. at 622.

Further facts will be developed as needed herein.

## II. DISCUSSION

**A. Motion for a New Trial**

A trial court may, in its discretion, vacate a judgment and award a new trial "if the interest of justice so requires." **Fed. R. Crim. P. 33(a).** A district court "should exercise its discretion to award a new trial sparingly." ***United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (quotations omitted).** A "jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." ***United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *Perry*, supra).**

Defendant offers two grounds in support of her motion for a new trial: (1) Dr. Linda Morgan, an unindicted co-conspirator, invoked her Fifth Amendment privilege before the jury during Varnado's trial thus creating an improper inference that Varnado was guilty; and (2) an improperly written jury instruction using the language "statute violated" rather than "statute charged" was error and improperly influenced the jury. **Brief in Support of**

**Motion for a New Trial, filed July 9, 2008, at 2-3.** The Government argues the Court should examine Defendant's motion for a new trial under the "plain error" standard because Defendant did not raise a timely objection before, during or after Dr. Morgan asserted her Fifth Amendment privilege before the jury. **Government's Opposition to Motion for New Trial,** *supra*, **at 3-4.** Alternatively, the Government contends Dr. Morgan's assertion of her Fifth Amendment privilege before the jury was neither in error or prejudicial to Varnado. *Id*. **at 4-6.** Lastly, the Government argues that the language "statute violated" in the written jury instruction as opposed to "statute charged" is an insufficient ground to support a new trial. *Id.* **at 7-9.**

Dr. Morgan, an unindicted co-conspirator, was called to testify by the Government during its case-in-chief. Dr. Morgan testified as to her name and then invoked her Fifth Amendment privilege not to testify and was excused from further testimony. **Tr. Vol. IV,** *supra*, **at 914-15.[5]** After presentation of all the evidence, the jury received the following instruction in open court:

---

[5] The Fifth Amendment provides that: "No person shall . . . be compelled in any criminal case to be a witness against himself." **U.S. Const. amend. V.**

> During the trial, the government called a witness who invoked her Fifth Amendment privilege not to testify. Every witness has this right to invoke his or her Fifth Amendment privilege against self-incrimination. The fact that a witness invokes his or her Fifth Amendment rights does not give rise to any inference. You should not draw any inferences against or in favor of either of the defendants, nor should you do so against or in favor of the government from the witness's refusal to testify. Nor should you speculate as to what the witness's testimony might have been had she elected to testify in the trial of this case.

**Tr. Vol. VII, at 10.** Before giving this instruction to the jury, the Court conducted a charge conference in chambers. Thereafter, the parties were invited to lodge any objections to the jury instructions on the record out of the presence of the jury. Defendant offered no objection to the above instruction. **Tr. Vol. VI, at 3-6.**

At trial, evidence was presented through several witnesses linking Varnado to the crimes charged in the indictment. Testimony was provided by unindicted co-conspirator Prince Yellowe, Tr. Vol. II, *supra*, at 578-801; Mary Helen Rheinecker, Tr. Vol. I, at 40-116; and a former administrative assistant, Clariben Anufuru, testified extensively, Tr. Vol. II, at 286-434, regarding Varnado's willing and knowing participation in the crimes charged. Based on the weight of the evidence against Varnado presented during the seven-day trial, Dr. Morgan's invocation of her Fifth Amendment privilege not to testify did not create an improper inference that Defendant

was guilty nor did it impact the verdict in this matter. Additionally, the jury is presumed to follow the instructions given by the court. **See United States v. Francisco, 35 F.3d 116, 119 (4th Cir. 1994) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions."))**. Accordingly, Defendant's argument is overruled.

Defendant next contends that the "improper jury instruction about the statutes Varnado 'violated' was in error." **Brief in Support of Motion for a New Trial, *supra*, at 6-7.** Challenged jury instructions are examined in the context of "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, **905 F.2d 784, 789 (4th Cir. 1990); see also *United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997) ("[E]ven where the use or denial of a jury instruction is in error, reversal is warranted only when the error is prejudicial based on a review of the record as a whole.").**

Defendant's counsel raised a concern, in open court and out of the presence of the jury, on behalf of both Defendants that "whenever the jury instructions reference the statutes alleged to be violated here, it indicates 'statute violated' " in the headings. **Tr. Vol. VII, *supra*, at 4.** Defendants requested the Court modify the instructions from "statute violated," "to have

the heading [read] 'statute charged,'" because "the text below [the heading] discusses what statute [the Defendants are] charged with violating." *Id.* The Court denied the Defendants' request finding the jury would not misinterpret the phrase. *Id.* **("I don't think the jury is going to be misled by that one word.").**

In re-examining the jury instructions as a whole, the Court concludes this argument is without merit. The jury instructions make perfectly clear to the jury that the burden in this case was on the Government to prove each and every element of the statutes "charged" or alleged to have been violated beyond a reasonable doubt. *See id.* **at 6-75.** The Court finds that the language "statute charged" is not reasonably likely to have influenced the jury in their deliberation in light of the entirety of the instructions given to them. Defendant's arguments on this issue are overruled.

## B. Motion for Judgment of Acquittal

A defendant may move for judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction" (a) at the close of the Government's evidence and before the case is submitted to the jury; (b) at the close of all the evidence after the defendant has rested; and (c)

after the jury has returned a verdict. **See Fed. R. Crim. P. 29 (a)-(c).** A defendant is entitled to renew a motion for judgment of acquittal within seven days after the jury returns a guilty verdict. **Fed. R. Crim. P. 29(c)(1).** In deciding whether to grant a motion for judgment of acquittal, the Court must view the evidence presented in the light most favorable to the Government, and "inquire whether a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." ***United States v. Singh*, 518 F.3d 236, 246 (4th Cir. 2008) (citing *United States v. Lentz*, 383 F.3d 191, 199 (4th Cir. 2004)).**[6]

Defendant advances the following contentions in support of her motion for judgment of acquittal: (1) the money laundering counts did not involve profits as that term was recently defined by the Supreme Court; (2) Counts 1-13, 15, 16, and 18 lacked sufficient evidence of proper venue; and (3) there was insufficient evidence to support Defendant's conviction of

---

[6]Rule 29 provides that a defendant may move the trial court for judgment of acquittal after a guilty verdict, and "the court may set aside the verdict and enter an acquittal." **Fed. R. Crim. P. 29(c).** Defendant made a motion for judgment of acquittal at the close of the Government's evidence based on insufficiency of the evidence and improper venue. These motions were denied. In denying the motion to dismiss on the issue of improper venue, the Court found that *United States v. Johnson*, 510 F.3d 521 (4th Cir. 2007), was controlling and that ruling is left undisturbed. **See Tr. Vol. IV,** *supra***, at 1090-98.**

Counts 14 and 17.  **Brief in Support of Judgment of Acquittal, filed July 9, 2008, at 1-3**.  These arguments will be addressed in turn.

Defendant cites a recent Supreme Court case decided June 2, 2008, *United States v. Santos*, 128 S. Ct. 2020 (2008), in support of her argument that "with respect to the money laundering Counts [Eleven through Eighteen], the Supreme Court recently clarified that for a money laundering conviction to stand pursuant to 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(h), the transaction charged must involve 'profits' of the underlying illegal scheme in order to constitute unlawful 'proceeds.'" *Id*. **at 1.** Defendant argues that "the Supreme Court made clear that the mere receipt of even unlawful proceeds or the use of the proceeds to *pay the expenses of the illegal activity* is not to be construed as an unlawful transaction involving *profits* as to qualify as a violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 1956(h)." *Id*. **at 9-10.**  The Government responds that the decision in *Santos* was limited to the narrow issue before the Supreme Court, namely, Justice Steven's contention that "the receipts rule does not apply to promotion money laundering cases involving gambling proceeds." **Opposition to Motion,** *supra,* **at 6-7.**  Therefore, Fourth Circuit precedent decided before *Santos* and which defined proceeds as gross receipts when

health care fraud is the underlying unlawful activity would be controlling. *Id.*, **at 7-8 (citing *United States v. Alerre*, 430 F.3d 681, 693-94 (4th Cir. 2005)) (other citations omitted).**

In the present case, Defendant was charged with promotion of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), and a money laundering conspiracy under 18 U.S.C. § 1956(h) in connection with healthcare fraud.[7] **See Superseding Indictment,** *supra***, at 12-14.** In contrast to the case here, *Santos* involved a defendant who was convicted of "one count of conspiracy to run a illegal gambling business (§ 371), one count of running an illegal gambling business (§ 1955), one count of conspiracy to launder money (§ 1956(a)(1)(A)(i) and § 1956(h)), and two

---

[7] Section 1956 provides:
Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
    (A)(i) with the intent to promote the carrying on of
    specified unlawful activity.
**18 U.S.C. § 1956(a)(1)(A)(i).** Additionally,
Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.
**18 U.S.C. § 1956(h).**

counts of money laundering (§ 1956(a)(1)(A)(i)).” **Santos, 128 S. Ct. at 2023.** The Supreme Court considered whether the term "proceeds" used in § 1956(a)(1) means "receipts" or "profits," and concluded that "proceeds" means profits from the criminal conduct and not the gross receipts that were used to pay the expenses of the ongoing enterprise. *Id.* **at 2023, 2031.** The Court noted that the definition for "proceeds" is not included in the money laundering statute and could mean either "receipts" or "profits." *Id*. **at 2024.** What the Court did not examine, and therefore, did not decide, is whether "proceeds" received in the context of health care fraud means "profits" or "receipts."

*Santos* was a plurality opinion authored by Justice Scalia, who was joined by Justices Souter, Thomas, and Ginsburg. Justice Stevens provided the deciding vote concurring in the judgment, but explained that an undefined word such as "proceeds" can have different meanings in different statutes. Thus, his vote was limited to the express issue before the Court, that is, whether proceeds from a gambling enterprise must be considered actual "profits" or "receipts." *Id*. **at 2031-34 (Stevens, J. concurring in the judgment).** Justice Stevens wrote that "this Court need not pick a single definition of 'proceeds' applicable to every unlawful

activity, no matter how incongruous some applications may be." *Id*. at **2032**. Justice Scalia explained that since Justice Stevens' "vote is necessary to our judgment, and since his opinion rests upon the narrower ground, the Court's holding is limited accordingly." ***Id*. at 2031 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).**

No matter how the "receipt" versus "profit" question is ultimately resolved in light of the plurality opinion, *Santos* did nothing to undermine the notion that a "profit" is a "profit" under the federal money laundering statute. In the present case, the undersigned concludes that the monies paid to Varnado were indeed "profits" as contemplated by the profit sharing agreement as discussed by Yellowe and Osuji. Defendant Varnado was charged and convicted of money laundering and conspiracy in connection with health care fraud committed against Medicare. The evidence at trial showed that she was the registered owner of Medisource, the sole signatory to the company's bank account, and that she agreed to a "profit sharing" agreement with Yellowe and Osuji. Yellowe's testimony makes clear that the agreement provided that any profit was to be distributed equally only *after* equipment costs, investment fees paid to Dr. Morgan, delivery costs, taxes for Chimatex's office and billing fees were deducted

from the money reimbursed by Medicare.  **Tr. Vol. III,** *supra***, at 611-23.**  In conclusion, the agreement to which the jury found Varnado to be a party, contemplated payment, that is, profit distribution, only after all expenses of the operation were paid.  Accordingly, this argument is overruled.

Defendant also moves for judgment of acquittal contending that Counts One through Thirteen, Fifteen, Sixteen, and Eighteen  lacked sufficient evidence of venue.  **Defendant's Brief in Support of Judgment of Acquittal,** *supra*, **at 12-16; Fed. R. Crim. P. 29(c)(1).**   Defendant previously moved for acquittal on the basis of improper venue at the close of the Government's evidence, after she rested her case, and again after the jury's verdict.  After the close of the Government's evidence, Defendant specifically moved for dismissal of Counts Two through Ten, Counts Twelve through Fifteen, and Count Eighteen and the motion was denied.  **Tr. Vol. IV,** *supra***, at 1093-98.**  The Court found "that the numerous contacts made within the State of North Carolina and activities occurring here as a part of the overall conspiracy support venue for the United States, Western District of North Carolina, for all 18 counts."  *Id***. at 1098.**  Defendant again moved for acquittal on the basis of improper venue after the close of all the evidence, and the Court again denied the motion.  **Tr.**

**Vol. VI, at 1479 ("Defendant Varnado reasserts her Rule 29 motion for the same reasons previously stated.").** After the jury returned a guilty verdict on all counts, Defendant again moved for acquittal based on improper venue and this motion was denied. **Tr. Vol. VII, at 76.** The Court has considered the evidence presented at trial and concludes that there is substantial evidence to support venue of all 18 counts in the indictment in the Western District of North Carolina. Accordingly, the Court will deny this motion for the reasons previously stated on the record. *See* **Tr. Vol. IV, at 1098.**

Defendant also argues for judgment of acquittal on the grounds that the conduct involved in Counts 14 and 17 were not properly attributable to her. **Defendant's Brief in Support of Acquittal,** *supra,* **at 16-17.** She contends that the "evidence at trial did not establish that money laundering occurred with respect to Varnado, because she is not one and the same with Medisource 2000." *Id*. at 16. Defendant concedes that "there was evidence at trial that Varnado was the registered owner of Medisource 2000, [but contends that] various witnesses testified Medisource 2000 was actually Yellowe's company and Varnado's in name only." *Id.* This argument is without merit.

A Rule 29 motion should be denied if "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." ***United States v. Tresvant*, 677 F,2d 1018, 1021 (4th Cir. 1982).** The jury heard the testimony of Yellowe and others, that Varnado, as the registered owner of Medisource 2000, was more than an owner in name alone; that she was observed at the Medisource offices on numerous occasions; and that money was deposited into a bank account for which she was the sole signatory by Chimatex, Inc. Therefore, the Court finds that, viewing this evidence in the light most favorable to the Government, the jury could have found the Defendant guilty beyond a reasonable doubt based on this evidence and her argument to the contrary is overruled.

### III. ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's motion for a new trial is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's motion for judgment of acquittal is **DENIED.**

20

Signed: October 24, 2008

Lacy H. Thornburg
United States District Judge